Andrews, J.
The parties to this action have, by their own acts, placed themselves in such a situation that it is almost impossible for the court to render a decision upon the issues in the case, to which plausible, and perhaps well-founded, objections cannot be made.
The plaintiff, as trustee, for the holders of $3,697,000 bonds issued under a so called consolidated mortgage upon all its property, by the defendant railroad company, and the defendant Scott, as surviving trustee for the holders of $261,000 bonds, issued by that company, under a prior mortgage, ask for a judgment directing the defendant railroad to pay the principal and interest due upon said bonds, and that, in default of such payment, the defendants be foreclosed of and from all. equity of redemption in and to the mortgaged premises, and that the same be sold and the proceeds applied to the payment of such principal and interest.
The defendant railroad, and the New York Loan and Improvement Company, which is a judgment creditor for over $1,000,000, defend the action, and claim that many of said bonds are voidable at the election of the railroad company, because they were fraudulently issued, and for that reason cannot be enforced as contracts; that most of the stock of the company was issued to the said bondholders, without payment of any consideration whatever therefor, and that—excepting bona fide purchasers, without notice— they are not entitled, even in equity, to receive anything for the benefits conferred by them upon the railroad company, until they shall have first paid to the company the par value of all the stock received by them.
The several counsel for the plaintiff, the bondholders* *386 the defendant railroad, and the Loan and Improvement Company have each presented elaborate printed briefs, in which their respective views are presented very fully and ably. The counsel of the plaintiff and bondholders strenuously insist that the defense set up is so unsound in law, and' so unmeritorious, that it is almost a waste of time to combat it; while the learned and experienced counsel of the railroad and the Loan and Improvement Company just as strenuously, insist that such defense is legally perfect, and, as matter of equity, most meritorious.
After a very careful and somewhat laborious consideration of the case, I find it impossible to entirely concur in the position taken by counsel for either side. Indeed, the case, to my mind, is so beset with difficulties, that I have not been able to reach a conclusion satisfactory to myself even; but as a decision, already too long delayed, must be rendered, I proceed to state my views. '
The consolidated mortgage, to foreclose which this action is brought, was executed to secure $4,000,000 six per cent, first mortgage bonds. Of those $1,754,000 wore given in exchange for $1,536,000 seven per cent, bonds, which were part of a previous -issue of $1,800,000; $1,142,000 were given in exchange for an equal amount of the bonds of the West Side and Yonkers Railway Company : and an amount was disposed of in various ways, sufficient with the two amounts above mentioned, to make up $3,697,000 now outstanding. Of the $1,800,000 issue, $264,000 were not exchanged, and are also still outstanding.
The circumstances under which these bonds were issued were as follows:
In 1869 the New York and Boston Railroad Company was organized to build a railroad from New York to Brewsters, in Putnam County, and in the same year made a mortgage to the Farmers’ Loan and Trust Company, to secure an issue of $2,500,000 bonds; and a second mortgage of $500,000 was also executed. This company and several others were finally, in 1873, consolidated into the New *387 York, Boston and Montreal Railway Company, which was to build a railroad, from New York City to Rutland, Vermont. The enterprise proving unsuccessful, the first mortgage given by the New York and Boston Company to the Farmers’ Loan and Trust Company was foreclosed, and, in 1876, the property was bought in by the Trust Company for the benefit of the bondholders.
After this sale some of the bondholders formed the New York, Westchester and Putnam Railroad Company, and sought to combine the various interests in this corporation, and complete a road from New York to Brewsters. This plan having been found to be impracticable, the bondholders, and one Lewis Roberts, entered into a new scheme, which led to the formation of the defendant company, the New York City and Northern Railroad.
The main features of this scheme are contained in a letter dated February 14, 1878, addressed by E. Noetzlin, who represented certain foreign bondholders, to A. V. Stout and others, who -were a committee of the stockholders of the New York, Westchester and Putnam Company, and were as follows:
A new company was to be formed with a capital stock of $2,250,000, and bonds to the amount of $1,800,000 were-to be issued. Of these securities, $1,370,000 stock and $500,000 bonds were to go to the old bondholders of the New York and Boston road and Roberts, and the remainder were to- be used for completing the road. The issue of all the stock and bonds was to be arranged through a contract for the construction of the road, to be made by the new company with Roberts. This scheme was carried out.
The defendant railroad corporation, was formed; the construction contract was made with Roberts; the bondholders and Roberts secured the amounts of stock and bonds above mentioned ; Roberts sold to a syndicate of bankers $1,000,-000 of bonds, with a bonus of $700,000 of stock, for $750,-000, and afterwards contributed $426,000 more of stock to *388 such syndicate, wliicli gave it a majority and control of the corporation, and the road was completed after a fashion.
The property conveyed to the new company by the bondholders and Roberts, and for which they received $1,370,000 stock and $500,000 bonds, consisted of an unfinished railway embankment, trestle work, bridges, culverts, etc., which were in a very bad condition, and which, upon the evidence in this case, were worth about $500,000.
In the certificate of incorporation of the new company twenty-six persons were named as incorporators, and thirteen as directors for the first year, but only two or three of the persons so named had any real interest in the enterprise. They were nearly all the representatives and instruments of the bondholders and Roberts, and were entirely under their control. No stock was issued to any of the corporators or directors, and a small percentage, paid by Roberts on subscriptions for stock, made on behalf of the directors, was' afterwards returned, or the stock issued, to him.
At the time of the formation of the new company Roberts had never been engaged in the construction of railroads, and had been adjudged a bankrupt. The syndicate bought the bonds sold to them, and received the so-called bonus of stock, with knowledge of all the circumstances under which the company was formed, and of the terms of the construction contract with Roberts.
Subsequently a scheme was formed by certain members of the syndicate and others for the construction of a short piece of road, and a bridge over the Harlem River, to connect the New York City and Northern Railroad with the elevated railroad system. It was estimated that this connecting link would cost about $600,000, and the arrangement was that it should bo built by another corporation to be incorporated under the Rapid Transit Act. This new company was to issue $400,000 of stock and $1,000,000 of seven per cent, bonds, the stock to be taken by the promoters of the scheme at par and the bonds at twenty cents on the dollar, and the new corporation was to be consolidated with the New York City *389 and Northern Bailroad Company, through a perpetual lease of the former to the latter.
The West Side and Yonkers Bail way was organized in accordance with this plan, except that $1,142,500 six per cent, bonds were issued instead of $1,000,000 of seven per cent., the price paid for them being 17^- instead of 20 cents on the dollar. Subscriptions to the stock were procured from twenty-six persons, but these were all nominal, as the stock was all issued to one of the members of the syndicate, and with the bonds, was distributed by him among the parties to the scheme. Four of the members of the syndicate received portions of such stock and bonds. The West Side and Yonkers Bailroad was leased to the New York City and Northern, and the latter company executed a new mortgage to secure $4,000,000 of bonds, and increased its stock by the amount of $750,000. Of the bonds $1,754,000 were issued in exchange for $1,536,000 of the old bonds of the New York City and Northern Bailroad, $1,142,500 were issued in exchange for an equal amount of the bonds of the West Side and Yonkers Bailroad, and all of the remainder except $15,500, were sold to the syndicate at from 85 to 86 cents on the dollar. Of the $750,000 increased stock $400,000 wore issued in exchange for an equal amount of stock of the West Side and Yonkers Bailroad, and the rest except $9,497.03, went to the syndicate. At the time of the merger and consolidation of the two companies they had five common directors.
It appears by the testimony of the secretary.of the Now York City and Northern Bailroad Company that the total benefit derived by that company from the issue of about $4,000,000 of bonds, and $3,000,000 of stock, was about $2,739,867.57.
In February, 1881, the defendant the New York Loan and Improvement Company purchased 14,200 shares of the stock of the defendant railroad • for something over $400,000 cash, and subsequently loaned to it over $1,000,000 cash, most of which was expended in improving the road. *390 and for which latter amount, with interest, one judgment for $923,697.49 was entered against the defendant railroad on May 23. 1882, and another for $92,934.74 on May 26, 1882.
The moneys so expended in improving the road were advanced upon an agreement between the Loan and Improvement 'Company and the president of the railroad company that, so far as the latter could give it, the former should have a lien upon the property of the road for the moneys so advanced, and that, so far as practicable, property acquired with such money should be taken in the name of the Loan and "Improvement Company ; and, in pursuance of this agreement, a large amount of real property and rights of way were acquired, the title of most of which was taken, and now stands, in the name of the latter company.
Upon the facts above set forth it is claimed, On behalf of the New York City and Northern Railroad Company, and Loan and Improvement Company, that the construction contract with Roberts, the original bonds issued by the two railroad companies, and the consolidated bonds, are void or voidable, and cannot be enforced as contracts, and that the holders of the bonds, other than Iona fide purchasers witli- ' out notice, are not, even in equity, entitled to receive anything for benefits conferred by them upon the company until they shall have paid to the company the par value of the stock delivered to them.
The first ground upon which this claim is made is, that the board of directors of the New York City and Northern Railroad, which made the contract with Roberts, were not directors in fact, but mere instruments of his, who acted under his directions, and did whatever he wished.
1 think the evidence fully sustains this claim, and the question is, did this fact render the contract voidable at the election of the company ?
Contracts made by the directors ‘of a corporation with one of their number, are voidable at the election of the corporation, without reference to the question whether or not they are beneficial to the company. If therefore Roberts *391 had been a director, there can be nodonbt that the corporation could repudiate the contract.
It is urged, however, that, as Roberts was not a director, the doctrine established by numerous decisions, as to dealings by directors with one of their own number, do not apply, because it is usually impracticable foreourts to ascer- ■ tain, or determine, how far directors represent third parties, and because it is difficult to establish any rule by which to decide what relations between directors and outsiders should give the corporation the right to disavow their contracts.
■ There is some force in this objection, and no case decision of the question is cited by either side. Upon principle, it would seem that, whatever practical difficulties might arise in ascertaining the facts in any given case, if it were proven that a board of directors had literally no wills of their own, but merely carried out the orders of a third party, in making a contract, the corporation should, if it desired, bo relieved from the contract, without being compelled to prove that it was fraudulent or disadvantageous to the company. It scorns tobe rather a dangerous doctrine to hold that, as matter of, law, a board of directors, who are mere dummies, can irrevocably bind a corporation by a contract with the person who has placed them iri office, for the .express purpose of having them make the contract.
To every real contract there must be at least two parties. In the case now under consideration, the so-called contract was made by one party, and that party was Roberts himself. The form of making a contract between the directors of the railroad company and Roberts was gone through with, but it was nothing but a form. It would have been entirely in •accordance with the fact if the contract had been headed, “ This agreement made between the New York City and Northern Railroad, party of the first part, by Lewis Roberts, and Lewis Roberts, party of the second part.”
There is not and cannot be any dispute about the facts. The whole scheme was arranged in advance, and was set •forth'in Noetzlin’s letter, to the committee of the stockhold *392 ers of the "Westchester and Pntnam Railroad. ■ T!$e bondholders and Roberts agreed in advance what the contract should he, and just what should be done with all the stock and bonds. They then placed in office a board of directors who were selected by them for the express and undisguised purpose of carrying, and who did at once carry, that arrangement into effect. The idle ceremony of submitting the proposed contract to a committee was gone through with, and the committee, as matter of course, promptly made a favorable report, and the directors, with * equal promptness, executed the contract. In other words, Roberts who was the active promoter of all that was done, made a contract on behalf of the company7 with himself, and I am very strongly inclined to the opinion that such so-called contract was voidable, at the election of the company7, without proof of unfairness or fraud.
The decision of the question as to the legality of the Roberts contract does not, however, necessarily turn upon the single point whether it was voidable because of the manner in which the board of directors was made up.
It is also claimed, on behalf of the defense, that the contract, and bonds issued pursuant thereto, were void, or voidable at the election of the company7, because the contract provided for the issue, and there actually was issued, to the parties interested in the scheme, a large amount of stock, for which nothing was paid to the company.
The entire capital stock was $2,250,000, and $1,800,000 of bonds were issued Of these securities the bondholders and Roberts received $1,370,000 of stock and $500,000 of bonds. The evidence shows that the property conveyed to the corporation by the bondholders and Roberts was worth about $500,000, and for this they received back $500,000 of bonds, secured by a mortgage upon the same property; that is, they took back in the shape of bonds as much as they put in, arid received $1,370,000 of full-paid stock for nothing. Apparently, the amount of stock and bonds which they were to receive was not determined with any *393 reference to the value of the property conveyed to the company. There is some testimony tending to show that the total amount of the capital stock and bonds to be issued was based, in part, upon some loose and exaggerated estimate of what the road would probably earn. All the facts, however, taken together, seem to warrant the conclusion that the bondholders and Boberts decided to take, and did take, as large an amount of stock and bonds as they thought it prudent to take, in view of the fact that they did not contribute a dollar in cash to the enterprise, and that it was ncsessary to obtain all the money required to complete the road, by disposing of the securities which they did not appropriate to themselves.
It must be conceded that in the contract with Boberts the value of the transaction between the bondholders and Boberts, on the one side, and the-corporation on the other, does not appear to be exactly as above set forth. In that instrument it was stipulated that Boberts should acquire all the outstanding interests and complete the road for $3,750,000, of which $2,250,000 should be paid to him in cash, and the remaining $1,500,000 in bonds. lie was, moreover, to procure subscriptions for the full amount of the capital stock, $2,250,000, which was to be issued to him as full paid, and with the bonds, was to be delivered to him jiro rata as the work progressed.
These provisions, however, did not express the real agreement or understanding, for it was not contemplated that Boberts should receive any cash or procure any subscriptions, but that all the stock and $1,500,000 of bonds should bo delivered to him, and that $1,370,000 of stock and $500,000 of bonds should be distributed in accordance with the scheme set forth in Noetzlin’s letter, and that the rest should be used to raise money to complete the road.
• It may be safely assumed that this form of contract was adopted out of deference to some supposed requirements of law, but whatever may have been the motive, the real question to be determined is not whether the ingeniously drawn *394 contract was valid upon its face, but whether a number of individuals can lawfully form a railroad corporation, and through a dummy board of directors, placed in office by themselves, issue to themselves $1,370,000 of full-paid stock without giving to the corporation any consideration whatever therefor.
It seems to me that little argument is necessary to show that such a transaction is not a lawful one ; even if the acts of the persons whom Roberts and his associates placed in control of the defendant railroad company are not voidable upon the sole ground that such persons were not real, but sham directors, it cannot be seriously claimed that such a board of directors, or any board of directors, lias the right to give away its stock.
The learned counsel for the plaintiff, the defendant, Scott, and the bondholders do, however, very earnestly contend that the Roberts contract was lawful and valid ; some of their arguments being based upon the claim that the $1,370,000 of stock was not given by the directors, or taken by Roberts and his associates without payment of a sufficient consideration, and that the transaction was therefore lawful and valid ; and other arguments being based upon the proposition that even if the acts of the directors were originally illegal it is too late to inquire into the matter, and that such illegality is not now available as a defense, either to the defendant railroad or to the Loan and Improvement Company. These arguments have been presented with great force and elaboration, and especially so in the exhaustive brief submitted by the counsel of the defendant Scott. I have carefully considered and reconsidered all the arguments and the authorities by which it is sought to sustain them ; but while some of them have weight it seems to me that there is a good answer to them all, and they fail to satisfy me of the legality of the transactions which resulted in the issue of the bonds and stock which Roberts and his associates received, or that such fact is not available as a defense in this action.
*395 It is said that a railroad corporation has the right to pay for the construction of the whole or any party of its road with its own stock and bonds; and no one can gainsay this proposition. But it is further said that for such purpose the corporation can issue and deliver its stock, as full-paid, at less than its par value and at any value, however small, which it may have when so delivered; and the case of Van Cott v. Van Brunt, 82 N. Y. 535, is greatly relied on as sustaining this view, and as justifying what was done in the present case.
The decision of the court of appeals in Van Cott v. Van Brunt has been criticised as being in conflict with “ the fundamental doctrine of corporation law, that the nominal stock of the corporation is held out to all the world as its actual capital, and every one is entitled to contract with the corporation on the assumption that it has been actually paid in, or that it may be reached ” (Taylor on Corp. 545, note).
Another elementary writer, speaking of the decision in question, says; “ It is submitted that this doctrine is supported neither by reason nor by authority ” (Morawetz on Corp. § 589, note).
Assuming, however, as I must, that Van Cott v. Van Brunt was correctly decided, and that it establishes as the law of this State that stock issued by a railroad corporation at its actual value, though less than par, to a contractor in payment for constructing the whole or any part of its road is to be regarded as full-paid stock, and that an action cannot be maintained by the corporation or its receiver to recover from the contractor or his assignee the difference between such actual and the par value of the stock, still it does not seem to me that this decision covers the case now under consideration.
• In that case the receiver of the corporation sought to recover from the contractor a proportionate share of the difference between the par value of the stock and the cost of the work done | while, in this, holders of bonds, who have used the machinery of a corporation, to issue to themselves *396 $1,370,000 of stock for nothing, arc seeking to compel payment by the corporation of bonds which they obtained through the same transaction. In that case also the contract tvas made by an independent board of directors with the approval of the stockholders, and, as the court found, in perfect good faith; in this, the whole transaction Avas arranged before the corporation was formed, and Avas carried out by a board of directors who were not free agents, but Averc instruments of those interested in the scheme. Moreover, in that case, Judge Millek, in his opinion, says: “The evidence also established that the stock never had any market value Avhatevervvliile in the present case it appears that 14,200 shares of the stock were sold by the syndicate to the defendant, The Loan and Improvement Company, for over $400,000.
Even assuming, therefore, that the directors of a railroad corporation, acting in good faith, can pav for the construction of its road with bonds and stock, at less than their par value, the insuperable difficulty in this case is, that the stock was not issued at its actual value, for the bondholders and Roberts got back in bonds the full value of all the property they put in, and then, through a facile board of directors, issued to themselves $1,376,000 of stock, Avhich had a large market value, without paying anything for it.
To meet this difficulty it is said that the value of the property conveyed to the corporation by the bondholders and Roberts greatly exceeded $500,000. But the only competent evidence on this point is that put in by the defendants, and it is fairly established by that evidence that the total value of such property was about that sum. The amount of the previous bonds issued under the mortgage executed by the New York and Boston road is certainly no evidence as to the Aralue of the property.
It is also urged that the Roberts contract was made in good faith, with no fraudulent intent, and was not constructively fraudulent. It is not necessary to hold that the parties acted corruptly, in a moral sense. They doubtless intended *397 to get a large .quantity of stock without paying anything for it, and probably supposed they had a right to do so. It was formerly usual, and the laws of this State require, that the stock of corporations should be paid for in money or its equivalent in property, but it has become so common to build railroads with borrowed money, and for the promoters of such enterprises to make immense fortunes from the proceeds of bonds and stock, for which nothing has been paid, that the requirements of the law are constantly disregarded, and parties interested in the building of railroads seem surprised to find that any such requirements are still in existence.
The view entertained by the able lawyer who prepared the Boberts contract is best ascertained from his own testimony :
“ Q. The discussions you heard about the Boberts contract themselves clearly exhibited the plan for carrying through this enterprise \
“ A. There was a plan ; that Was part of it.
“ Q. And I suppose' it is true that the plan proposed to use the securities, to be issued by the road, bonds and stock, for the purpose of building it %
“A. Undoubtedly.
“ Q. He was to receive a certain amount in cash, and he agrees to take and subscribe to the same amount ?
“ A. Yes.
“ Q. Did anything occur in the negotiations or conversations in reference to the formation of this plan, which explains that in any other way than the explanation it appears to have on its face ?
“ A. I can give you the explanation, how it may appear to yon I cannot tell. The various outstanding interests were sought, and the requirements for satisfying them, bringing them in and getting assents were such doubtless that a cer-. tain amount of stock was required perhaps, to be given in bonuses. It was my method of causing this stock to be issued as full-paid stock—a method which I have followed in various other cases, and- which I supposed to be a correct method *398 of making the facts, exigencies, or actual facts conform apparently, if not really, to the requirements of the statute.”
It is said that the formation of the New York City and Northern Bailroad was substantially a re-organization of another road, and the statutes of this State authorizing such re-organizations are referred to. It is sufficient to say that the new company was not formed under, or with any reference to, those statutes.
It it also urged that the Boborts contract has been executed, and that the defendant railroad has received and retains the benefits derived by it from that contract, and before it can rescind, it must return what it has received.
The rule undoubtedly is, that a party seeking to rescind a contract for fraud, must return what he has received ; but if the wrong-doer has made it impossible that the identical property should be returned, the party seeking to rescind should be allowed to return its fair equivalent. The defendant railroad cannot return the property conveyed to it by the bondholders and Boberts, but its inability to do so was caused by their wrongful acts. Upon what terms the railroad should be relieved from the contract, will be considered hereafter.
It is also contended that no one but the “ confiding public,” which may have purchased the securities, on the supposition that the company received value for them, was injured by their issue, and that the defendant company has no standing in court to defend this action for the benefit of stockholders or creditors ; that the Loan and Improvement Company purchased its stock and lent its money with knowledge, or means of knowledge, of all the facts connected with the issue of the $1,370,000 of stock, and that for this reason, it cannot defend this action on the ground that such stock was illegally issued; that if either the defendant railroad company or Loan and Improvement Company could ever have raised the questions now brought up, they have by various acts and omissions waived that right; that the same affirmative action should have been taken in the courts *399 to have it set aside, and that having failed to do so, hotli the railroad company and the Loan and Improvement Company have been guilty of laches, and that a court of equity should not now entertain the defense which they are endeavoring to maintain in this action.
These objections have some force, but I do not think that any of them are well taken. They are, as it seems to me, founded partly on erroneous assumptions of fact, and partly upon what I regard as a misapprehension of the duties which a corporation owes to its stockholders and creditors, and of the rights of the latter to protect themselves, by resisting the appropriation of all the property of a corporation, to pay creditors whose claims originated in fraud.
Upon the whole case, the conclusion which I have reached, though with doubt and hesitation, is, that the Roberts contract, and the bonds issued thereunder, are voidable at the election of the defendant, the New York City and Northern Railroad Company, and except as to those held by bona fide purchasers without notice, cannot be enforced as contracts, whatever rights to equitable relief their holders may have. And as the syndicate took the bonds which they bought, both the $1,000,000 and those which they subsequently purchased, with full knowledge of all the facts connected with their issue, I think that all the bonds which they received stand in the same position as the $500,-000 which went to the bondholders and Roberts.
If I am correct in the conclusion as to the bonds originally issued by the New York City and Northern Railroad, there can be little doubt that the $1,142,500 issued by the West Side and Yonkers Company are also invalid, at the like election. These bonds, with $400,000 of stock, were all issued to meet a proposed expenditure of $600,000. The nominal terms upon which these securities were issued were, par for the stock- and ■ twenty cents on the dollar for the bonds. But the whole matter, including the creation of the corporation and the price of the securities, was arranged *400 in advance by the parties who received the securities, part of whom were directors of the company itself. And the whole scheme for the leasing of this company to the New York City and Northern was arranged by the boards of directors of the two companies, which had five common directors; and part of the members of one board were, moreover, the agents and representatives of members of the other board.
My conclusion with regard to these $1,142,500 of bonds which were exchanged for an equal amount of the consolidated bonds of the New York City and Northern Company, and also with reference to the $801,000 of the consolidated bonds purchased by "the syndicate, with knowledge of the circumstances under which they wrere issued, is, that they stand in the same position as the $500,000 issued to the bondholders and Roberts. The result is that none of the bonds secured by the consolidated mortgage, nor of the $264,000 of bonds, still outstanding, which were secured by the Scott and Palmer mortgage, can be enforced as contracts, except so far as they are held by bona fide purchasers for value, without notice ; and this brings me to the consideration of questions no less difficult and perplexing than those wdiich have been already considered.
The consolidated bonds, and the $264,000 secured by the Scott and Palmer mortgage, being voidable at the election of the defendant railroad, and that election having been, exercised by defending this action, in what situation does this decision place the holders of the bonds other than bona fide purchasers.
It is conceded that the New York City and Northern Railroad Company has received from the various bondholders property and money to the amount of $2,759,867.57, and it is contended by the learned counsel for that company, and the Loan and Improvement Company, that the defendant railroad company, having elected that the bonds shall be declared void, can retain such property and money, and that no bondholder, unless he be a bona fide purchaser, is *401 entitled, even in equity, to receive anything for the benefits conferred by him upon the railroad company, until he shall have first paid to the company the par value of all the stock received by him ; this claim, however, being qualified by the concessson that the holders of consolidated bonds which were exchanged for the $1,142,500 of bonds issued by the West Side and Yonkers Company, and members of the syndicate holding any of the $801,000 of bonds purchased by them, can receive what they paid for such bonds, without making any payments on account of stock.
After much consideration I am not able to concur in this view of the equitable rights of the bondholders. There are several objections to it, some of which seem to me insuperable.
The general rule is that a party who elects to rescind a contract, on the ground of fraud, must restore all that he has received, or its equivalent, and he cannot, ordinarily, elect to rescind in part and affirm in part. It is claimed, as I understand, that the bondholders can be required to pay to the company the par value of the stock received by them, upon the ground that they occupy the same position that they would have done if they had formally subscribed for suuh stock. But the bonds issued pursuant to the Roberts contract were received by him and his associates in the scheme, and by the syndicate, together with the stock. The consideration that passed to the company was indivisible, and the receipt of the stock and bonds was one transaction. I do not, therefore, see how it is possible for the railroad company to elect to consider the Roberts contract and the bonds void, and at the same time elect to consider the obligation to pay for the stock, if such obligation ever existed, as in full force; nor do I see how it can exercise the election to treat the bonds as void without restoring to the bondholders the property, or its value, and the money which it received for the bonds.
Moreover, it is not claimed that the original bondholders, not even Roberts himself, ever actually subscribed or agreed *402 to pay for any stock. The claim on behalf of the defense is, that the stock was received as a gift or bonus, and the making of such gift or bonus is claimed to be, and I hold is, such a fraud upon the company, its stockholders and creditors, as to give the company the right to consider the bonds toid as contracts.
Under these circumstances I am inclined to think, especially in view of the decision in Van Cott v. Van Brunt (82 N. Y. 535), that the bondholders never assumed the obligations of subscribers to the stock^and cannot be required, as a condition to receiving back what they delivered to the company, to pay in the par value of the stock.
Moreover, the bondholders acted under legal advice and probably believed that the whole transaction was a lawful one, and it seems to be a harsh exercise of the powers of a court of equity to declare the bonds void and permit the railroad to retain benefits received from the bondholders, amounting to nearly $3,000,000, and, with interest, to a much larger sum, unless they now pay to the company the par value of the stock, which they supposed they had the right to receive without incurring any obligation to pay for it. There are other serious objections to the claim that the bondholders can be required to pay for their stock as a condition precedent to receiving anything from the company, but as I do not see how those above suggested can be overcome, it is not necessary to discuss them ; and this leaves for consideration a question which is not the least difficult-of the many troublesome ones that are involved in this complicated matter.
If I am correct in holding that all the outstanding bonds are voidable at the election of the defendant railroad company—and that the bondholders cannot be called on to pay for the stock—as the company has exercised that election by defending this action, upon what terms should it be relieved from the payment of the bonds ?
There is certainly room for much discussion in determining this very important point. It is a question in regard *403 to wliicli there may well be honest differences of opinion, and one which has been a great stumbling-block to me in my efforts to reach a satisfactory decision of this case. The conclusion, however, to which I have finally come is, that if the bonds are to be declared void at the election of the railroad company, the only thing which a court of equity can do, is to restore the company and the bondholders, as far as it can be done, to the position which they would have occupied if the bonds had not been issued.
The company cannot return to the old bondholders of the New York and Boston Railroad and to Roberts the property which they conveyed to it, for it forms a part of its road, which has been completed at a large expense. It can and should, however, pay to such bondholders and Roberts the value of that property.
If the other bonds are not to be enforced as contracts at their face, the company should repay to the bondholders what it received from them.
It seems to me, however, that the bondholders, as a condition of being reimbursed for the benefits they have conferred upon the company, must, if they can, surrender to the company the stock which they received. In cases in which this cannot be done, the question will have to be hereafter determined upon what equitable terms, if any, they can be relieved from this condition.
Of course bona fide purchasers of bonds for value, who bought without notice of the facts which render the bonds invalid, must be paid in full.
The total amount which the company ought to pay as a condition of relief must be ascertained, and a reasonable opportunity be afforded to pay it; and if such payment is not made, a judgment of foreclosure and sale must be entered.
There will necessarily have to be a reference to take testimony as to the various matters to be ascertained before the amount which the company must pay, as a condition of relief, can be ascertained.
*404 Counsel can be heard as to the questions concerning which testimony should be taken upon the settlement of the order of reference, but among such questions the following should probably be included:
Who are the holders of the seven per cent, bonds, and what amounts are held by each person 2
By whom are the six per cent, bonds held, and in what amounts 2
From whom did the present holders of each class acquire their bonds, and under what circumstances, as to good faith, notice of invalidity, and payment of value2
Perhaps it may be necessary that each bond should be traced back from the present holder to the original holder, and that the circumstances of each transfer as to good faith, notice, and payment of value should be inquired into.
It may also be requisite to extend the inquiry so as to ascertain what coupons were attached to the different bonds, at the time of each transfer, and what knowledge each transferee had of the causes of default in the payment of interest.
Such of the outstanding six per cent, bonds as were, exchanged for seven per cent, bonds should be traced, having regard to the foregoing points of inquiry—to the seven per cent, bonds for which they were exchanged.
If any bondholders who are entitled to be reimbursed what they paid, on surrender of stock, cannot do so, the question may arise what, if any, equitable condition of relief shall be substituted, and it may be proper upon the reference to afford such bondholders an opportunity to place the court in possession of the facts which will enable it to determine that question ; and in this connection such inquiries as the following might be pertinent.
What shares of stock, if any, does each present holder of bonds own 2
What holders of bonds have ever owned stock, or more than they now own. If any stock has been disposed of, when, and upon what consideration 2 .
II. General Term, October, 1886.
Appeal from an order directing a reference and denying an application for a settlement and making of findings of fact and law, and motion by respondent to dismiss the appeals.
By the order of reference entered npon the decision of the Special Term, it was (indicating by brackets the parts of the order modified by the general term on appeal, post, p. 415):
“ Ordered, that it be and it is hereby referred to William N. Armstrong, Esq., counsellor at law, to take [ ] proof and report with bis opinion to the court upon the following questions of fact:
“ Who arc the holders of the bonds secured by the mortgage to George Slesman Scott and Oliver Hazard Palmer, mentioned in the complaint, and what amounts of said bonds are held by each, of-such holders, and what are the numbers of the bonds held by them respectively.
“ Who are the holders of the bonds secured by the consolidated mortgage mentioned in the complaint, and what amounts of said bonds are held by each of such holders, and what are the numbers of the bonds held by them respectively.
*405 It may be proper to inquire what each of the original holders of bonds did with the stock which came to him with the bonds.
As I am of the opinion that the land acquired with money lent to the railroad company by the Loan and Improvement Company, upon the agreement that the latter company should have a lirct lien upon it, cannot be sold under the mortgage, and as it is described in the testimony by numbered parcels only, the referee should accurately ascertain what this property consists of, describing it by metes and bounds, and should also ascertain the amount due to the Loan and Improvement Company, for which they have a lien upon it.
An order of reference may be settled on five days’ notice. x
“ From whom did the present holders of each of said bonds acquire the same, and under what circumstances as to good faith, notice of invalidity and payment of value.
“ What transfers of all of said bonds have been made, and to whom, and when, and under what circumstances upon each transfer as to good faith, notice of invalidity and paymént of value, from the time of the original issue of said bonds until the same were acquired by the present holders thereof. As to every such transfer, what coupons were attached to the said bonds respectively, at the time of such transfer, and in case any unpaid, overdue coupons were attached to any of said bonds at the time of any such transfer, what knowledge, information or notice did each transferee have of the causes of default in the payment of interest.
“In making the above inquiries said referee [ ] shall trace each of such bonds by its number, and shall ascertain, also, as to all six per cent, bonds now outstanding which I were issued in exchange for seven per cent, bonds, the numbers of said seven per cent, bonds for which the same were so exchanged.
“ To whom were the shares of the capital stock of the New York City and Northern Railroad Company originally issued.
“What disposition was made of such stock by each of the original holders thereof, to whom disposed of, when, and for what consideration; what subsequent transfers of said stock have been made, and as to each transfer when it was made, by whom, to whom and upon what consideration.
“ It is further ordered, that the said referee, in prosecuting the inquiry herein provided for, concerning the circumstances attending any transfer of bonds as to good faith and notice of invalidity, shall particularly ascertain what knowledge or notice any transferee of bonds had concerning the contract between Lewis Roberts and the New York City and Northern Bailroad Company, mentioned in said opinion, concerning the facts and circumstances referred to in said opinion, attending the organization of the New York City and Northern Bailroad Company, and the issue of the bonds and stock of that company, and also the facts and circumstances attending the organization of the West Side and Yonkers Bailway Company, and the issue of the bonds and capital stock of that company.
“ And it is further ordered, that the said referee ascertain and report to the. court a description, by metes and bounds, of all the lands acquired by the said New York City and Northern Bailroad Company,,or by the New York Loan and Improvement Company, for its use, being the same lands described in the testimony in this cause by numbered parcels, whether the record-title to such lands stands in the name of said railroad company, or in that of said Loan and Improvement Company, and also ascertain and report the total amount due from said railroad company to said Loan and Improvement Company for the advances for which the last mentioned company has a lien, as set forth in its answer in this cause.
“And it is further ordered, that any of the parties to this cause have leave, from time to time, to apply for fur- ' tlier directions respecting the reference herein ordered.”
Upon the filing of the opinion, upon which the foregoing order was entered, the plaintiff, and the defendant Scott, as surviving trustee, applied to the trial judge to fix a time within which the parties to the action should submit proposed findings of- fact and conclusions of law, and for a reference to compute the amount due on the Scott and Palmer mortgage, and for judgment- against the parties to the action for foreclosure of the Scott and Palmer mortgage, as prayed for in their answer. - This application was denied upon'the ground that the reference was not similar to one which might he ordered after a trial, to compute the amount due upon a mortgage adjudged to- be. valid.-bnt was a reference to ascertain the facts necessary to. enable the court to. decide upon what terms the railroad company should be relieved from liability under the mortgage, and that no findings of fact or conclusions of law' could now be made (Decision reported ante, p. 64).
From the order entered upon this decision, and from the order directing the reference, the plaintiff and the defendant Scott appealed.
By agreement of counsel, approved by the court at the time, the questions arising upon the refusal to settle findings only, were first argued, the merits of the main questions in the controversy being reserved for further hearing.
William Allen Butler, Julien T. Damies and Edward Lyman Short, for the plaintiff and the defendant Scott, appellants.
. James C. Carter and Lewis Cass Ledya/rd, for the defendant railroad company, respondent.
Daniels, J.
The action was brought to foreclose a mortgage given by the railway company upon the property to secure an issue of bonds amounting to the sum of $4,000,000. The right of the plaintiff to this relief was resisted by the railway company and others, contesting the legal validity of the bonds. The result of the trial of the issues, including these subjects, was the conclusion of the court that the bonds had been unlawfully issued, and that they were voidable at the election of the-railway company, with the ’exception of those which had passed into the hands . of holders for value without notice. After reaching this conclusion, the order of reference was made directing the referee;to'.inquire who were tlie'-holdersofthe bonds in controversy, and for- what they had been-acquired, and what consideration had been paid for the bonds by. their presentí, or preceding. holders. Other subordinate directions were given, but it was for the object of more especially and fully obtaining information upon .these subjects that the reference was ordered.
*409 This order of reference has been resisted upon the ground that when the court reached the decision which it did, an interlocutory judgment should have been entered, embodying findings of fact and law which might be reviewed by the parties by vay of an appeal or a motion for a new trial. But the system of practice now existing has not required that an interlocutory judgment shall be entered as the result of such a decision. Neither was the practice mandatory in this respect, as it previously existed in courts of equity in this State, for they were at liberty to hear the case fully and completely, and determine it, by a final decree ; or, which was the more ordinary system followed, to direct an interlocutory decree, when that should be proper, providing for further proceedings to ascertain details for the relief before a master. The jurisdiction of the court sanctioned either one of these two proceedings as they might be deemed the most practical or advisable. And the present system of practice has made no change in this respect in trials of these issues of fact, for it contains no direction that an interlocutory judgment shall be entered upon the determination of the court as to the controlling rights of the parties in the litigation. The Code has been framed in such language as to permit, without requiring, an interlocutory judgment, and to provide for exceptions to be presented and filed, and a review to be had, either by way of appeal or a motion for a new trial; and these provisions will be found to this effect in sections 1200, 1349, 1001 and 1231. But even such an appeal or motion is not indispensable for the review of the judgment, for that may be had upon an appeal from the final, judgment, when the intention to review on such appeal the interlocutory judgment shall be expressed in the notice (Code Civ. Pro. §§ 1230, 1301, 1316 and 1350). But neither of these sections has been so framed as to require an interlocutory judgment to be entered in the action in which a trial may be had before the court or a referee, but they at most regulate tile practice authorized to be pursued when such a judgment shall have been entered in the action. *410 The mandatory provisions directing that a report shall be made and filed, relate only to the determination of the whole issue in the action. And they are contained in section 1022, and subd. 3 of section 1221. Such a report or decision then becomes indispensable for the determination' of the controversy in the action.
That it was not intended to be obligatory upon the court to make and file this decision before the final determination of the action is further evident from the latter portion of section 1013 of the Code, which permits the court of its own motion, in an action triable without a jury, to direct a reference to a referee to report his findings upon one or more specific questions of fact involved in the issue. That must necessarily be done before the complete decision of the action. And it is after that and when the remaining issues in the case have been tried, that it has been provided by section 1226 for the entry .of the judgment. And the reference ordered in this case seems to be within the language of this section.
By section 1015, also, the court has been authorized of its own motion to direct a reference to take an account either after an interlocutory or final judgment, or when it is necessary to do so for the information of the court. And under this authority this reference seems to have been provided for. And that was suggested as correct practice in Camp v. Ingersoll, 86 N. Y. 433. This authority, it is’true, is restricted to the taking of an account, but this language includes more than the mere adjustment of items, charges, credits and figures. It permits inquiries to be made in this manner where details are to be obtained and settled, and such was the practice which has been followed in courts of equity (Story Eq. Jur. 5 ed. §§ 441, 453).
In the last of these sections it is stated that “ in virtue of this general jurisdiction in matters of accounts, courts of equity exercise a very ample authority over matters apparently not very closely connected with it, but which naturally, if not necessarily, attach to such a jurisdiction.” What the *411 court required in the case was a statement -of the bonds which the railway company had attempted to issue under the mortgage, and that was, strictly speaking, a matter of accounting, as inquiries of this nature have been set on foot and followed in courts of equity. And as incidents of that accounting, it was within the authority of the court to direct proof to be taken as to the manner in which the bonds had passed into the hands of the parties holding them, and the consideration for which they had been received. The inquiry as to all these subjects was within this broad authority, allowing the court to direct a reference to take the account. The plain object was to furnish the data upon which the details of the action might be determined, and when the report of the referee shall be made and heard that, as well as his conclusions, was subject to be reviewed, corrected or set aside as the case may require, under the authority of section 1232 of the Code.
To enable the referee intelligently to take proof upon, and hear and report concerning the subject of the reference, no other statement of that subject was required than that which was contained in the order. An interlocutory judgment was not necessary for this purpose. The action still remained before the same court, although the proof upon the essential issues, as the pleadings presented them, had been concluded, and the court on that part of the case had reached what was considered a final decision.
But it was not in a condition finally to determine or declare the particular rights of the parties. This further information to be sought through the intervention of the reference, was to complete the trial, and when it shall have been obtained the court will be in a condition to proceed and determine the case by a final judgment. And before that can be entered, conclusions of fact and law will be required to be settled and filed, presenting what shall be deemed to be the result of the evidence and the rights and obligations of the parties. And it will facilitate this determination to obtain the proof and report contemplated by *412 the order, and place the action in a condition in which, upon an appeal, all the questions arising in it may be finally decided, and the rights ot' the parties fixed and determined.
If an interlocutory judgment had been provided for, no more than this would have been accomplished through its intervention, for the ultimate and final decision of the action would, if the views of the trial court should he sustained, still await the hearing and accounting directed by this order.
The order does affect substantial rights in.the action; and it is the subject of an appeal under subdivision 4 of section 1347 of the Code. And while it was regular for the court to make the order within the authority of the sections of the Code already mentioned, it is still reviowable under this subdivision, and subject to correction, if the inquiries directed by it should be held to be broader than the court had the power to give. Whether the decision made by the court upon the effect of the evidence produced before it is erroneous or not, is not now to be considered.
That subject has not been discussed by the counsel, but the suggestion has been made on behalf of the plaintiffs that a day should be assigned for an argument of the merits of the controversy; and if that is still to be insisted upon by the counsel, the case may yet, as the order is appealable, be brought before the consideration of the court for the determination of the questions arising upon the evidence. But probably the more judicious course of proceeding will be to' complete the hearing before the referee, and then bring up these questions for review after final decision and judgment in the action'shall have been entered. For the present, however, it will be sufficient to hold that the reference was authorized, if the court was warranted in the conclusions upon which "the order proceeded. • The parties affected by the order were entitled by their appeal to bring it before the court for its consideration and decision; but to avoid any conclusive effect from it hereafter the order should be modified declaring that the reference is without *413 prejudice to the consideration of any question arising upon the trial, whenever any legal action shall he taken for their review in the subsequent progress of the litigation. With these modifications the order of reference, as well as that denying the application for findings of fact and law, should now, subject to the plaintiff’s right to bring on the merits of the appeal, be affirmed, and the motion made to dismiss the appeals should be denied without costs to either party.
Davis, P. J., and Beady, J., concurred.
III. General Term, February, 1887.
Appeal from interlocutory order of reference.
The General Term having held that the application for settlement of findings was properly denied, and that the order of reference was the subject of an appeal, the merits of the order of reference came on for argument under the proviso in the affirming order giving the appellants leave to have a further hearing on the merits.
The appellants, however, merely contended for a modification of the order of reference, reserving the other questions raised on the appeal, as to the soundness of the conclusions upon which the order was based, until the report of the referee should be made.
William Allen Butler (Butler, Stillman & Hubbard, attorneys) for the plaintiff, appellant.
The order of reference was broader than the court had power to make. Not only as to title, but as to contract validity, negotiable bonds of corporations, payable to bearer and transferable by delivery, are commercial paper, and entitled to the application of the rules of law which govern the rights of the holders of commercial paper (National Bank of Washington v. Texas, 20 Wall,, 72; Goodman v. Simons, 20 How. (U. S.) 365 ; Murray v. Lardner, 2 Wall. 110, 121; Commissioners v. Clark, 94 U. S. 278; Seybel v. Nat. Currency B’k, 54 N. Y, 288; Coloma v. Eaves, 92 U. S. 484; Commissioners v. Bolles, 94 U. S. 104. And see Hackett v. Ottawa, 99 U. S. 86; Sherman Co. v. Simons, 109 U. S. 735; Anderson Co. v. Beal, 113 Id. 227; Dallas Co. v. McKenzie, 110 U. S. 686; Dutchess Co. Mut. Ins. Co. v. Hachfield, 73 N. Y. 226 ; Welch v. Sage, 47 N. Y. 143). Possession and production of such negotiable paper is proof of title, and prima facie conclusive proof of right to recover the full value thereof. If fraud in the inception of the paper is established, or any fact invalidating it in the hands of the party to whom it was first made, then the holder must prove that he, or some one from whom he derives title, paid value without notice of the invalidating circumstances, but such proof being given and not overthrown, it is conclusive as to the right of the holder to recover, irrespective of the right of any antecedent holder (Smith v. Sac. Co., 11 Wall. 139 ; Grocers’ Bk. v. Penfield, 69 N. Y. 502, and cases cited by Rapallo, J., p. 505; Montclair v. Ramsdell, 107 U. S. 147; Hall v. Featherstone, 3 Hurlstone & N. 284; Cromwell v. Co. of Sac., 96 U. S. 51).
The law being as above stated, the bona fide holders of the bonds secured by the mortgage to the plaintiff, as trustee, are entitled to the benefit of it in this action. The court, at special term, had no right to require anything further of the bondholders thah proof, as to any bonds held by them, of their possession and purchase for value, without notice of any of the alleged invalidating circumstances attending their original issue. This being done, the holders giving such proof become thereby entitled to recover the face of the bonds and interest, and to the benefit of the mortgaged security. To require them to give proof of transactions in the bonds held by them, prior to their bona fide purchase or acquisition of them, or to permit proof of any such prior dealings, to which they were not privy, would be to violate the rule which protects innocent holders of negotiable securities, and to try an issue in which they have no concern.
It was error in the court at special term to direct an inquiry which substantially amounts to tracing the title and the circumstances of transfer of each bond from the time of its original issue to the hearing before the referee.
Julien T. Davies and Edward Lyman Short {Davies, Cole de Rapadlo, attorneys) for the defendant Scott, trustee, appellant.
James C. Carter and Lewis Gass Ledyard, for the railway company, respondent.
Pee Curiam.
Although the court is of the opinion that the appellants have been unnecessarily alarmed as to the construction which might be placed by the referee upon the order of reference herein, in order to remove any ambiguity in respect to the order, it has determined that the order, after the words 66 the court of its own motion,” maybe modified, so as to read as follows [indicating modifications by italic]:
6‘ Ordered that it be and it is hereby referred to William N. Armstrong, Esq., counsellor at law, to take such proof as may be offered by either of the parties to this action or by the holders of any of the bonds mentioned in the complaint, and to report the same with his opinion to the court upon the following questions of fact.-
“ Who are the holders of the bonds secured by the mortgage to George Slesman Scott and Oliver- Hazard Palmer, mentioned in the complaint, and what amounts of said bonds are held by each of such holders, and what are the numbers of the bonds held by them respectively.
“ Who are the holders of the bonds secured by the consolidated mortgage mentioned in the complaint, and what amounts of said bonds are held by each of such holders, and what are the numbers of the bonds held by them respectively.
“ Erom whom did the present holders of each of said bonds acquire the same, and under what circumstances as to good faith, notice of invalidity and payment of value. ^
*416 “ What transfers of all of said bonds liavo been made, and to whom and when and under what circumstances upon each transfer as to good faith, notice of invalidity and payment of value from the time of the original issue of said bonds until the ’same were acquired by the present holders thereof. As to every such transfer what coupons were attached to the said bonds respectively at the time of such transfer, and in case any unpaid overdue coupons were attached to any of said bonds at tiie time of any such transfer, what knowledge, information, or notice did each transferee have of the causes of default in the payment of interest.
“ In making the above inquiries said referee may .receive such evidence• as may be offered by any of the parties to this action, or by the holders of any of the bonds mentioned in the complaint, tracing each of such bonds by its number, and ascertaining also as to all six per cent, bonds,” and then following the language of the order appealed from to the end thereof.
The order, as above modified, is affirmed without costs.